## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CAPTAIN DARRELL OBER,** | : | **CIVIL ACTION NO. 1:04-CV-1669** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **COMMISSIONER JEFFREY** | : | |
| **B. MILLER, LT. COLONEL RALPH** | : | |
| **PERIANDI, MAJOR LEONARD** | : | |
| **MCDONALD, LT. COLONEL JOHN** | : | |
| **BROWN, MAJOR CHARLES** | : | |
| **SKURKIS, CORPORAL ROBERT** | : | |
| **MRGICH, MAJOR COLEMAN J.** | : | |
| **MCDONOUGH, JACK LEWIS,** | : | |
| **JOANNA REYNOLDS, and** | : | |
| **CAPTAIN ROBERT B. TITLER,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

This is § 1983 civil rights action filed by Darrell Ober ("Ober"), a former

captain with the Pennsylvania State Police ("State Police"), against nine State

Police employees.[1]  Ober's principal allegation is that these nine employees

retaliated against him for exercising his First Amendment rights to petition the

court for redress of grievances and to speak out on matters of public concern.

---

[1] The defendants are Commissioner Jeffrey B. Miller ("Miller"), Lieutenant Colonels Ralph Periandi ("Periandi") and John Brown ("John Brown"), Majors Leonard McDonald ("McDonald"), Charles Skurkis ("Skurkis"), and Coleman J. McDonough ("McDonough"), Captain Robert B. Titler ("Titler"), Corporal Robert Mrgich ("Mrgich"), and civilian employees Jack L. Lewis ("Lewis") and Joanna N. Reynolds ("Reynolds").

Presently before the court are the parties' cross-motions for summary judgment (Docs. 43, 49).  The motions have been briefed and are ripe for disposition.  The court would be remiss if it did not describe the difficulties presented by the summary judgment record.  For purposes of illustration, the statements of material facts and responses thereto contain more than 3,200 paragraphs and are nearly 400 pages in length.  These voluminous fact statements are accompanied by 375 exhibits and nearly 200 pages of legal briefs.  Suffice it to say that considerable judicial resources have been expended to resolve the myriad of issues set forth therein.  <u>Contra</u> L.R. 56.1 (requiring parties to file a "*short and concise* statement of the material facts").  For the reasons that follow, defendants' motion (Doc. 43) will be granted in part and denied in part, and plaintiff's motion (Doc. 49) will be denied.

2

## I.   **Statement of Facts**[2]

Ober enlisted as a cadet with the State Police on July 20, 1981.  Over the next

twenty-four years, he was promoted to the ranks of trooper, corporal, sergeant,

---

[2] Constructing the facts of the instant case was further complicated (see description of record, supra pg. 2) by the inappropriate record citations throughout Ober's responsive statement of material facts.  (See Doc. 60); see also L.R. 56.1 ("Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.").  Rather than citing to portions of the record that possess independent evidentiary value, Ober cites primarily to the 1,454 paragraph statement of material facts in support of his own motion for summary judgment.  (See, e.g., Doc. 61 ¶¶ 1, 12-14, 16-17, 19, 22, 24, 26-28, 30-33, 36, 38-44, 46-51, 53-55, 57-61, 63, 66-79, 72-75, 77-79, 81, 83-85, 88-94, 98-99, 101-105, 108-110, 112-127, 129-133, 135, 138-140, 142-146, 149, 151, 153.)  This method of citation has required the court to engage in the type of circuitous research and fact-finding that the United States Court of Appeals for the Third Circuit has repeatedly deemed unnecessary and taxing on judicial resources.  See Doeblers' Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 n.8 (3d Cir. 2006) ("'Judges are not like pigs, hunting for truffles buried in' the record.").  The court has conducted an independent review of the more than 5,000 page record, but where no evidence supports Ober's position, the court has accepted defendants' statement of facts as true.  See L.R. 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."); infra Part II.

   The court will also take this opportunity to advise counsel for plaintiff of the necessity of proof-reading.  See PA. R. PROF'L CONDUCT R. 1.1; see also L.R. 83.23.2.  Minor grammatical errors are inevitable; however, the most cursory examination of plaintiff's statement of material facts (Doc. 50) reveals numerous blatant mistakes, including the following sentence:  "The 310 311 a medication reason for making reasons for granting the writ." (Id. ¶ 382.)  Plaintiff's 1,454 paragraph statement of material facts is also riddled with repetition and irrelevant information that unnecessarily lengthens an already voluminous document.  See L.R. 56.1 (requiring parties to file a "*short and concise* statement of the material facts").  For example, the fact statement contains the following five sentences as separate paragraphs:

   1.   "Ober's July 25, 2003 memo plainly states, CC:  Don Bailey.";
   2.   "Ober's memo shows a CC to his attorney." ;
   3.   "Ober's memo indicated a "CC" to Don Bailey.";
   4.   "Ober's memo clearly states:  "CC: Don Bailey[.]"; and,
   5.   "Ober's July 25, 2003 [memo] indicates a "CC" to Don Bailey."
(Doc. 50 ¶¶ 275, 324, 436, 550, 1122.)

lieutenant, and captain before retiring on July 1, 2005. (Doc. 46 ¶ 1; Doc. 61 ¶ 1; Doc. 48, Ex. 1.) During his tenure at the State Police, Ober filed four lawsuits in which he claimed that he was retaliated against by members of the State Police. This is the third in that series of four lawsuits. The court will summarize the facts and procedural history of Ober's other three lawsuits before delving into the specific facts underlying the instant case.

### A.    <u>Ober I</u>[3]

<u>Ober I</u> centered around Ober's decision to withhold information from the individuals in his direct chain of command and ultimately from then-Commissioner Paul J. Evanko ("Evanko"). In the fall of 1998, Ober learned from an FBI agent that State Police officials were suspected of taking bribes from police academy applicants. Believing that the FBI's investigation should be kept confidential, Ober did not report the information to his direct superiors. (<u>See</u> No. 01-0084, Doc. 102 at 5.) Instead, Ober sought guidance from Lieutenant Colonel Robert Hickes ("Hickes"), who was not in Ober's direct chain of command. Hickes advised Ober not to discuss the matter with anyone else. (<u>Id.</u> at 5-6.) On May 12, 1999, Ober learned that the FBI's investigation had concluded and informed Evanko about it. (<u>Id.</u> at 6.) Ober alleged that a series of retaliatory acts followed, including an

---

[3]  <u>Ober v. Evanko</u>, No. 01-0084 (M.D. Pa. 2001). The defendants in <u>Ober I</u> are Commissioner Paul J. Evanko, Deputy Commissioners Thomas Coury, Joseph Westcott, and Hawthorne Conley, State Police attorneys Syndi Guido ("Guido") and Reynolds, and a member of the Pennsylvania Governor's staff. (<u>See</u> No. 01-0084, Doc. 15 ¶¶ 8-9; Doc. 35 ¶¶ 8-9.)

administrative investigation into his alleged failure to follow the chain of command,

the denial of educational and overtime opportunities, an inquiry into his personal

affairs, an attempted transfer, and the denial of his promotion to major.  (Id. at 7-

10.)

Accordingly, Ober I was filed on January 16, 2001, alleging *inter alia*

violations of Ober's First Amendment rights.  (No. 01-0084, Doc. 1.)  By

memorandum and order dated August 27, 2002, Judge William Caldwell denied

defendants' motion for summary judgment with respect to Ober's First Amendment

claim.  (No. 01-0084, Doc. 102 at 11-16.)  Defendants filed an interlocutory appeal

contesting the denial of their motion for summary judgment.  On November 25,

2003, the United States Court of Appeals for the Third Circuit reversed, holding that

Ober's speech was not protected because he had violated State Police regulations

when he made the decision to bypass the chain of command.  See Ober v. Evanko,

80 F. App'x 196, 200-02 (3d Cir. 2003).

**B.     Ober II**[4]

On November 29, 2002, Ober II was filed against several State Police

attorneys and an investigator who had been involved in Ober I.  (No. 02-2186,

Doc. 1.)  Ober II alleged that the defendants had filed fallacious briefs in an attempt

to mislead the court, suborned perjury, plotted unlawful schemes to discredit at

---

[4] Ober v. Brown, No. 02-2186 (M.D. Pa. 2002).  The defendants in Ober II are
Captain Rick Brown ("Rick Brown") and State Police attorneys Guido, Reynolds,
and Barbara Christie ("Christie").  (See No. 02-2186, Doc. 1 ¶¶ 10-11; Doc. 2 ¶¶ 10-
11.)

least two of Ober's key witnesses, and acquired irrelevant personal information in an attempt to intimidate Ober.  (No. 02-2186, Doc. 38 at 3-4.)  Ober styled these allegations as claims of First Amendment retaliation for exercising his right to file Ober I.  (No. 02-2186, Doc. 1 ¶¶ 6-7.)  On September 3, 2003, this court granted defendants' motion for judgment on the pleadings, holding that a First Amendment retaliation claim was not a proper remedy for trial counsel's alleged misconduct.  (No. 02-2186, Doc. 38 at 5-6.)  On July 14, 2004, the Third Circuit affirmed.  See Ober v. Brown, 105 F. App'x 345, 347 (3d Cir. 2004).

## C.   Ober IV[5]

Ober IV, filed on March 1, 2007, alleged that State Police employees "secretly met and engineered a plan to deter Ober from speaking publicly or filing a lawsuit regarding purported corruption involving" Miller.  (No. 07-401, Doc. 17 at 3.)  Ober alleged that, at this secret meeting, Miller granted Guido and Brown permission to file a criminal complaint against Ober, alleging that Ober had perjured himself in Ober I.  (Id. at 4.)  Ultimately, Guido and Brown compiled an investigative report and delivered it to the United States Attorney's Office, which declined to pursue charges against Ober.  (Id.)  However, Ober conceded that he first learned of this allegedly retaliatory conduct *after* he retired from the State Police.  (Id. at 4-5.)  Holding that a person of ordinary firmness would not be deterred from speaking by

---

[5]   Ober v. Guido, No. 07-0401 (M.D. Pa. 2007).  The defendants in Ober IV are Guido, Christie, Reynolds, Rick Brown, Skurkis, and Miller.  (See No. 07-0401, Doc. 20 ¶ 6.)

a retaliatory act of which he or she was unaware, Judge William Caldwell granted

defendants' motion to dismiss <u>Ober IV</u>.  (<u>Id.</u> at 8; <u>see also</u> No. 07-401, Doc. 27 at 3.)[6]

### D.   <u>The Instant Case</u>

Ober filed the instant action on July 28, 2004.  (<u>See</u> Doc. 1.)  An amended

complaint was filed on December 20, 2004.  (<u>See</u> Doc. 10.)  Ober's amended

complaint alleges that defendants:  (1) retaliated against him for exercising his First

Amendment rights to petition the court for redress of grievances and to speak out

on matters of public concern, (2) violated his Fourth Amendment right to be free of

unlawful searches and seizures, (3) violated his First, Sixth, and Fourteenth

Amendment rights to confer with counsel, (4) denied him equal protection of the

laws in contravention of the Fourteenth Amendment, and (5) defamed him and

---

[6] To the extent that Ober seeks to rely upon the facts underlying <u>Ober IV</u> as
retaliatory actions in the instant case, such claims are barred by principles of
collateral estoppel and will be resolved in favor of defendants without further
discussion.  <u>See</u> <u>Rutter v. Rivera</u>, 74 F. App'x. 182, 187 (3d Cir. 2003) ("In order for
the doctrine of collateral estoppel to apply, (1) the issue decided in the prior
adjudication must be identical to the one presented in the later action, (2) there
must have been a final judgment on the merits, (3) the party against whom
collateral estoppel is asserted must have been a party or in privity with a party to
the prior adjudication, and (4) the party against whom collateral estoppel is asserted
must have had a full and fair opportunity to litigate the issue in question in the
prior action.").

subjected him to false light misrepresentation in violation of state law.[7]  The facts

underlying these claims are set forth below.

---

[7] The court notes that Ober attempts to raise claims of civil conspiracy, intentional infliction of emotional distress ("IIED"), and perjury for the first time in his summary judgment motions and briefs.  (See Doc. 60 at 54-60 (adding claims of civil conspiracy and IIED); see also Doc. 49 ¶ 2 (describing Ober's perjury claim against Periandi)).  A party may not utilize a summary judgment motion as a vehicle to raise claims not supported by the pleadings.  Tome v. Harley Davidson Motor Co., No. 1:CV-06-2155, 2007 WL 3125090, at *7 (M.D. Pa. Oct. 24, 2007) ("Claims not alleged in a complaint may not be raised for the first time in opposition to a motion for summary judgment.").  Any attempt to do so will result in the newly asserted claims being deemed waived.  See Shingara v. Skiles, No. 1:04-CV-0621, 2007 WL 210800, at *3 n.5 (M.D. Pa. Jan. 24, 2007) (holding that claims raised in the first instance at the summary judgment phase are waived); Protocol Elecs., Inc. v. Transolutions, Inc., No. Civ. 03-4162, 2005 WL 1106132, at *5 (D.N.J. Apr. 29, 2005) ("[I]t is impermissible, without leave of court, to raise new claims for the first time on summary judgment."); see also Krouse v. Amer. Sterilizer Co., 126 F.3d 494, 499 (3d Cir. 1997).  Ober's failure to raise the civil conspiracy, IIED, and perjury claims in his amended complaint therefore results in a waiver of those claims, and the court will grant defendants' motion for summary judgment with respect to these claims without further consideration.  Assuming arguendo that Ober had appropriately raised a perjury claim in his amended complaint, his claim would nevertheless fail because allegations of perjury "provide the basis for a criminal action only" and do not entitle a plaintiff "to any recovery under civil law."  See Digianvittorio v. D'Antonio, No. 96-6781, 1997 WL 13681, at *4 (E.D. Pa. Jan. 13, 1997).

Ober's amended complaint also seeks a declaration that a particular State Police field regulation was improperly applied to Ober.  (See Doc. 10 ¶¶ 135-151.)  While defendants' motion for summary judgment purports to seek judgment against plaintiff on all claims, defendants have asserted no arguments in support of their request for relief with respect to the declaratory judgment claim.  Accordingly, the court will deny defendants' motion for summary judgment with respect to Ober's declaratory judgment claim.  In the event that defendants intend to seek summary judgment with respect to this claim, they shall be permitted to file a renewed motion for summary judgment addressing the declaratory judgment claim.

1.   __Memorandum and Subsequent Investigation__

On July 25, 2003, Ober composed a memorandum that detailed what he believed to be acts of public corruption committed by Miller and Periandi. Specifically, the memorandum alleged that Miller and Periandi had used their power and influence as State Police officials to aid a state senator in attacks against a political enemy.  (See Doc. 48, Ex. 25.)  Before distributing the memorandum, Ober sought the advice of Don Bailey, Esquire regarding whether the contents of the memorandum met the legal definition of public corruption and, if so, how best to distribute the information.  (Doc. 50 ¶ 336; Doc. 58 ¶ 336.)  On advice of counsel, Ober submitted the memorandum to his immediate supervisor, McDonald, on July 31, 2003.  The memorandum contained the statement "CC: Don Bailey."  (Doc. 50 ¶ 324; Doc. 58 ¶ 324.)  McDonald attempted to persuade Ober not to distribute the memorandum and refused to formally accept it, although he retained a copy.

Approximately two months after receiving Ober's memorandum, McDonald began to suspect a link between the memorandum and the inquiries of a reporter from the Philadelphia Daily News.  McDonald informed Ober about the inquiries and questioned him about his distribution of the memorandum and about his interactions with Attorney Bailey.  (Doc. 50 ¶¶ 403, 409, 551; Doc. 58 ¶¶ 403, 409, 551; Doc. 52, Ex. 61.)  Ober informed McDonald that he had decided not to submit the memorandum because "he wanted to go under the radar."  (Doc. 52, Ex. 61.)  McDonald also informed Skurkis, Periandi, and John Brown about the contents of the memorandum.  (Doc. 50 ¶¶ 295, 398, 431, 452; Doc. 58 ¶¶ 295, 398, 431, 452.)

9

On October 17, 2003, John Brown acquired and analyzed Ober's workplace telephone records.  (Doc. 50 ¶¶ 579, 581, 584; Doc. 58 ¶¶ 579, 581, 584.)  Ultimately, the telephone records revealed no evidence that Ober had contacted the media.  (Doc. 52, Ex. 61; Doc. 50 ¶ 617; Doc. 58 ¶ 617.)  On November 3, 2003, John Brown confiscated the hard drive from Ober's government-issued computer but again found no information indicating that Ober had contacted the media.  (Doc. 48, Ex. 62; Doc. 50 ¶¶ 583, 621; Doc. 58 ¶¶ 583, 621.)

On November 19, 2003, the <u>Philadelphia Daily News</u> published an article addressing the same allegations of police corruption that were contained in Ober's memorandum.  (Doc. 48, Ex. 29.)  Four months later, on March 23, 2004, Periandi submitted an internal complaint which prompted a formal investigation into the source of the leak to the <u>Philadelphia Daily News</u>.  Periandi's complaint did not mention Ober as a target of the investigation.  (Doc. 48, Ex. 30.)  Periandi's complaint was assigned to McDonough for adjudication and to Mrgich for investigation.  (Doc. 50 ¶¶ 36-37, 1081; Doc. 58 ¶¶ 36-37, 1081.)  Ultimately, McDonough was unable to determine who had leaked the information to the <u>Philadelphia Daily News</u>.  (Doc. 50 ¶ 74; Doc. 58 ¶ 74.)  However, at some point, Ober became the focus of the investigation.  (Doc. 50 ¶ 77; Doc. 58 ¶ 77.)  On July 26, 2004, Mrgich conducted an interview of Ober, during which Ober revealed that he had shared the memorandum with Attorney Bailey.  (Doc. 48, Ex. 31.)  During the interview, Ober was represented by a union attorney.  (Doc. 50 ¶¶ 1256-57; Doc. 58 ¶¶ 1256-57.)  On the same day, Periandi temporarily transferred Ober from the

10

bureau of liquor control enforcement ("BLCE") to the bureau of emergency and special operations ("BESO") as a special projects officer.  (Doc. 48, Ex. 32.) Following his transfer, Ober was prohibited from accessing BLCE records or facilities, including his former office, and was required to surrender his BLCE equipment.  (Doc. 52, Ex. 294.)  In addition, his police car was searched, his hard drive was imaged a second time, and his government-issued laptops were seized. (Doc. 52, Ex. 294; Doc. 50 ¶¶ 625, 697; Doc. 58 ¶¶ 625, 697.)

Two days later, on July 28, 2004, McDonough issued a summary report to Ober, which was designed to summarize the investigation and to inform Ober of his purported violations and of the evidence against him.  (Doc. 48, Ex. 34; Doc. 50 ¶ 71; Doc. 58 ¶ 71.)  On August 2, 2004, McDonough issued Ober's final disciplinary action report, in which McDonough sustained the allegation that Ober provided confidential information to Attorney Bailey.  (Doc. 48, Exs. 35, 50.)  On the same day, Ober filed a grievance contesting the conclusions of the disciplinary action report.  (Doc. 48, Ex. 19.)

On September 10, 2004, Titler told Ober that he would be recommending that Ober be disciplined for his misconduct.  (Doc. 52, Ex. 76.)  Ober challenged this recommendation in a second grievance dated October 5, 2004.  (Doc. 48, Ex. 20.)  On October 15, 2004, Titler provided Miller with a suggestion for Ober's punishment. In arriving at this suggestion, Titler considered the disciplinary action report and other investigative reports, Ober's prior discipline, employee performance reviews, and official personnel files, similar cases, issues of officer safety, confidentiality of

11

information and complainants, dangers to the community, and Ober's willingness to

disseminate information to unauthorized persons.  (Doc. 48, Ex. 36; Doc. 50 ¶¶ 1160,

1182, 1231; Doc. 28 ¶¶ 1160, 1182, 1231.)  On October 21, 2004, Miller approved the

suggested punishment.  (Doc. 48, Ex. 36.)  On the following day, Titler issued Ober's

notification of disciplinary action with the suggested twenty day suspension,

transfer to Troop H, and demotion to the rank of Sergeant.  (Doc. 48, Ex. 37.)  On

November 8, 2004, Ober filed a third grievance contesting his punishment.  (Doc. 48,

Ex. 21.)  That grievance was still pending when Ober retired on July 1, 2005, so

Ober's recommended punishment was never implemented.  (Doc. 48, Ex. 1; Doc. 46

¶ 133.)

### 2.   <u>Other Alleged Retaliatory Actions</u>

Aside from the aforementioned conduct related to Ober's memorandum and

the subsequent investigation, Ober alleges that defendants engaged in a number of

unrelated retaliatory actions.  First, Ober alleges that he was denied reappointment

to the Pennsylvania Emergency Management Agency ("PEMA")[8] and the

Centennial Book Committee.[9]  Ober began his involvement with PEMA as an

emergency preparedness liaison officer in 1993 and voluntarily resigned from that

---

[8]  PEMA is a volunteer organization charged with coordinating and
responding to emergencies in Pennsylvania.  (Doc. 46 ¶ 87; Doc. 61 ¶ 87.)

[9]  The Centennial Book Committee is a volunteer organization composed of
approximately five members whose goal is to prepare a book documenting the
history of the State Police.  (Doc. 48, Ex. 18 at 220.)  The Committee's participants
receive no compensation for their involvement.  (<u>Id.</u> at 221.)

position in 2000.  (Doc. 50 ¶¶ 556-557, 568, 570; Doc. 58 ¶¶ 556-557, 568, 570.)  He

requested reinstatement to PEMA on January 20, 2003 and again on March 3, 2004.

On both occasions, he was informed by a State Police employee that there were no

vacancies for emergency preparedness liaison officers at the agency.  (Doc. 52, Exs.

250, 252; Doc. 50 ¶ 560; Doc. 58 ¶ 560.)  Ober was removed from the Centennial Book

Committee by former-Commissioner Evanko in 1999.  (Doc. 50 ¶ 953; Doc. 58 ¶ 953.)

He sought permission to return to the Committee on January 20, 2003.  (Doc. 52,

Ex. 253.)  In an email dated January 22, 2003, a State Police employee responded as

follows:

> I have been advised that it may be better to what [sic] until your legal issues
> are settled with the Department before having you rejoin the book
> committee.
> Hopefully everything works out for you soon.

(Id.)

Second, Ober alleges that his requests to attend two training academies were

denied.  In June 2004, McDonald denied Ober approval to attend the National

Liquor Law Enforcement Academy in San Diego, California.  McDonald admitted

that the investigation into Ober's conduct was a factor in his decision, as was a

concern about Ober's availability to attend the conference if he were disciplined.

(Doc. 52, Ex. 232; Doc. 50 ¶¶ 963, 965; Doc. 58 ¶¶ 963, 965.)  Ober also alleges that he

was never selected to attend the FBI training academy, for which he first applied in

1993.  (Doc. 50 ¶ 986; Doc. 58 ¶ 986.)

Third, Ober alleges that Miller retaliated against him by failing to promote him on five separate occasions between February of 2003 and March of 2004.  On each occasion, Miller selected four or fewer captains from a pool of between nineteen and forty-two for promotion to the position of major.[10]  (Doc. 48, Exs. 43-48.)  Miller testified that when selecting candidates for promotion, he chooses the candidate with the skill set that is most appropriate for the vacant position. (Doc. 48, Ex. 2 at 162.)  In support of his retaliation claims, Ober alleges that Miller cancelled an objective examination for promotion from captain to major on March 3, 2003, and replaced it with a more subjective selection process in order to avoid promoting Ober.  (Doc. 48, Ex. 38; see also Doc. 50 ¶ 723; Doc. 58 ¶ 723.)  Miller testified that he cancelled the examination due to budgetary constraints.  (Doc. 46 ¶¶ 72-73.)

Fourth, Ober alleges that McDonald intentionally withheld his employee performance review for five months as an act of retaliation.  Ober's 2003-2004 review was due from McDonald in March of 2004, but was issued by McDonald on September 20, 2004.  (Doc. 48, Ex. 41; Doc. 50 ¶ 1005; Doc. 58 ¶ 1005.)  McDonald admits that he decided to withhold the employee performance review because of the pending investigation against Ober.  (Doc. 50 ¶ 998; Doc. 58 ¶ 998.)  Ultimately,

---

[10]  Specifically, Miller promoted the following numbers of captains to the position of major without selecting Ober:  (1) three of nineteen on February 1, 2003, (2) four of thirty-eight on April 12, 2003, (3) one of forty-one on July 5, 2003, (4) one of forty-two on February 28, 2004, and (5) one of forty-one on March 13, 2004. (Doc. 42, Exs. 43-48.)

Ober was given an unsatisfactory rating for the first time in his history of

employment with the State Police.  (Doc. 50 ¶ 992; Doc. 58 ¶ 992; <u>see also</u> Doc. 52,

Ex. 205 at 3.)  The unsatisfactory rating was given in the category of "work habits"

and was accompanied by the following explanation:

> The unsatisfactory rating reflects the results of an internal investigation
> culminating in disciplinary action for improper dissemination of confidential
> Department information, contrary to Department Regulations.  Although
> Capt. Ober is efficient and organized, and adheres to attendance and safety
> regulations, his violation of the regulation concerning dissemination of
> confidential information is viewed as serious especially given his rank, and
> strongly affects his rating in this category.

(Doc. 52, Ex. 205 at 3.)

Finally, Ober alleges that Reynolds and McDonough directed threatening

and harassing statements towards him during a training session for commissioned

officers on August 6, 2004.  (Doc. 46 ¶ 134; Doc. 61 ¶ 134.)  Specifically, Reynolds

referred to Miller as the "ultimate client" in a manner that Ober viewed as

retaliatory.  (Doc. 46 ¶ 137; Doc. 61 ¶ 137.)  Reynolds testified that her use of the

phrase "ultimate client" was intended to illustrate that her ethical obligations as

legal counsel for the State Police are to Miller.  (Doc. 43, Ex. 10 at 52-53.)  During the

same training session, McDonough drew an analogy between the disciplinary

systems of ancient Rome and the State Police.  (Doc. 43, Ex. 33 at 183-84.)  Ober

admits that neither Reynolds nor McDonough referred to him by name or otherwise

identified him during the training session.  Nor did they refer to Ober's court filings

or to the misconduct he was alleged to have committed.  (<u>Id.</u> at 182-85.)

### 3. **Statements by Lewis and Titler**

Ober also alleges that defendants Lewis and Titler defamed him and placed

him in a false light.  Turning first to Lewis, Ober alleges that, on August 18, 2004,

the <u>Philadelphia Daily News</u> published an article about Ober, to which Lewis

responded.  (Doc. 48, Ex. 53.)  Lewis's response provides, in pertinent part, as

follows:

> The Aug. 18 story also fails to mention that State Police Capt. Darrell Ober
> initiated two federal district court lawsuits against the department alleging
> that improper disciplinary action was taken against him.  Both of these suits
> were dismissed and the Third Circuit Court of Appeals subsequently upheld
> the dismissals.

(<u>Id.</u>, Ex. 54.)  Ober also alleges that Titler defamed him when he issued the

notification of disciplinary action, which states:

> It was my determination that the actions of Captain Ober in this matter were
> in violation of the following Field Regulations:
> FR 1-1.05, Dissemination of Information
> FR 1-2.02, Performance of Duty
> FR 1-1.18, Interference with Investigations
> FR 1-2.02, Competency

(Doc. 52, Ex. 83 at 1.)

## II.  **Standard of Review**

Through summary adjudication the court may dispose of those claims that do

not present a "genuine issue as to any material fact" and for which a jury trial

would be an empty and unnecessary formality.  <u>See</u> FED. R. CIV. P. 56(c).  It places

the burden on the non-moving party to come forth with "affirmative evidence,

beyond the allegations of the pleadings," in support of its right to relief.  <u>Pappas v.</u>

16

City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action proceed.  Pappas, 331 F. Supp. 2d at 315.

The court is permitted to resolve cross-motions for summary judgment concurrently.  InterBusiness Bank, N.A. v. First Nat'l Bank of Mifflintown, 318 F. Supp. 2d 230, 235 (M.D. Pa. 2004) (describing concurrent resolution of cross-motions for summary judgment as "a formidable task"); see also Irvin v. United Mine Workers of Am. Health & Ret. Funds, No. 05-1072, 2007 WL 539646, at *1 (W.D. Pa. Feb. 15, 2007); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 1998).  When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion.  FED. R. CIV. P. 56; see also Strategic Learning, Inc. v. Wentz, No. 05-467, 2006 WL 3437531, at *4 (M.D. Pa. Nov. 29, 2006).

## III.   **Discussion**

Pursuant to § 1983, Ober alleges that defendants violated his rights pursuant to the First, Fourth, Sixth, and Fourteenth Amendments.  Ober further alleges that defendants Lewis and Titler defamed him and subjected him to false light

misrepresentation in violation of state law.  The court will turn first to a discussion

of Ober's § 1983 claims.

A.      **Section 1983 Claims**[11]

Section 1983 of Title 42 of the United States Code offers private citizens a

means to redress violations of federal law by state officials.  See 42 U.S.C. § 1983.

The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress . . . .

Id.  Section 1983 is not a source of substantive rights, but merely a method to

vindicate violations of federal law committed by state actors.  Kneipp v. Tedder, 95

F.3d 1199, 1204 (3d Cir. 1996).  To establish a claim under this section, the plaintiff

must show a deprivation of a "right secured by the Constitution and the laws of the

United States . . . by a person acting under color of state law."[12]  Id. (quoting Mark v.

Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).

-------

[11]  As a threshold matter, Ober has failed to allege or proffer any evidence
that Lewis was personally involved in any of the constitutional violations alleged.
See Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) ("A[n individual] defendant
in a civil rights action must have personal involvement in the alleged wrongdoing . .
. .").  Therefore, the court will grant summary judgment in favor of Lewis on each of
Ober's § 1983 claims.

[12]  Defendants apparently concede for purposes of the instant motion that
they were acting "under color of state law" at all times relevant hereto.

Satisfaction of these elements, however, does not guarantee recovery. Certain officials, including police officers and other state actors performing "discretionary functions," are shielded from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999); Saucier v. Katz, 533 U.S. 194, 200-01 (2001). This doctrine, known as "qualified immunity," provides not only a defense to liability, but "immunity from suit." Hunter v. Bryant, 502 U.S. 224, 227 (1991); Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). In Saucier, the Supreme Court explained the analytical process for determining when to apply the privilege of qualified immunity:

> A court required to rule upon the qualified immunity issue must consider . . . this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendant's] conduct violated a constitutional right? This must be the initial inquiry . . . . If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.

Saucier, 533 U.S. at 201. Thus, the qualified immunity analysis requires a two-step inquiry.

> First, the court must determine whether the facts alleged show that the defendant's conduct violated a constitutional or statutory right. If so, the court must then determine whether the constitutional or statutory right allegedly violated by the defendant was "clearly established." If the court concludes that the defendant's conduct did violate a clearly established constitutional or statutory right, then it must deny the defendant the protection afforded by qualified immunity.

19

Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006); cf. Wright v. City of Phila., 409

F.3d 595 (3d Cir. 2005) (discussing whether the constitutional violation is a separate

inquiry or part of the qualified immunity analysis); Kaucher v. County of Bucks, 455

F.3d 418, 423 n.2 (3d Cir. 2006).

When immunity is raised at the summary judgment stage, the court's analysis

of the merits of the claims for purposes of summary judgment essentially merges

with its analysis of the existence of a deprivation of federal rights for purposes of

immunity.  See Gruenke v. Seip, 225 F.3d 290, 299-300 (3d Cir. 2000); Russoli v.

Salisbury Twp., 126 F. Supp. 2d 821, 838-41 (E.D. Pa. 2000); see also Grant v. City of

Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the]

assertion of qualified immunity is a careful examination of the record . . . to

establish . . . a detailed factual description of the actions of each individual

defendant (viewed in a light most favorable to the plaintiff).").

Proceeding under the above framework, the court will consider each of

Ober's § 1983 claims to determine, first, whether he has offered prima facie

evidence of his claims and, second, whether defendants enjoy qualified immunity

on those claims for which Ober has presented sufficient evidence.

### 1.    Prima Facie Evidence of Ober's Claims

Ober has raised the following § 1983 claims: retaliation, unlawful search and

seizure, right to counsel, equal protection, and conspiracy.  The court will address

each of these claims *seriatim*.

### a.    **First Amendment Retaliation**

The First Amendment "protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." <u>Garcetti v. Ceballos</u>, 126 S. Ct. 1951, 1957 (2006).  To state a prima facie claim of retaliation, a public employee must allege that:  (1) the activity in question is protected by the First Amendment, (2) the defendants' acts were retaliatory, and (3) the protected activity was a "substantial motivating factor" of the alleged retaliation.  <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 241 (3d Cir. 2006); <u>see also</u> <u>Chambers v. Pennsylvania</u>, Civ. A. No. 1:04-CV-0714, 2006 WL 3831377, at *7 (M.D. Pa. Dec. 28, 2006); <u>Baldassare v. New Jersey</u>, 250 F.3d 188, 195 (3d Cir. 2001).  A defendant can rebut a prima facie case of retaliation by showing that "the same adverse action would have taken place in the absence of the protected conduct." <u>Chambers</u>, 2006 WL 3831377, at *7; <u>see also</u> <u>Baldassare</u>, 250 F.3d at 194.  Whether the activity is protected is a question of law, while the remaining inquiries are questions of fact. <u>Hill</u>, 455 F.3d at 241.

### i.    **Protected Activity**

A public employee's statement is a protected activity if:  (1) the employee spoke as a citizen about a matter of public concern, and (2) the government employer did not have "an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." <u>Id.</u> (quoting <u>Garcetti</u>, 126 S. Ct. at 1958).  In the matter *sub judice*, Ober alleges that engaged in protected activity when he:  (1) filed <u>Ober I</u>,

Ober II, and Ober III,[13] (2) filed several employee grievances, and (3) submitted the

July 25, 2003 memorandum.  Defendants concede for purposes of summary

judgment that Ober's federal lawsuits and employee grievances are protected

activities.  (See Doc. 47 at 15 n.4.)

Defendants argue that Ober's July 25, 2003 memorandum was not protected

because Ober was speaking as a government employee performing an official duty

rather than as a citizen.  See Garcetti, 126 S. Ct. at 1959-60.  The court agrees.  In

Garcetti, the plaintiff, a deputy district attorney, prepared a memorandum that

contained allegations of corruption within a police department.  The plaintiff later

admitted that he had drafted the memorandum pursuant to his duties as a deputy

district attorney.  Id. at 1960.  The Supreme Court held that "when public

employees make statements pursuant to their official duties, the employees are not

speaking as citizens for First Amendment purposes, and the Constitution does not

insulate their communications from employer discipline."  Id.  Similarly, in the

instant case, Ober's July 25, 2003 memorandum contained allegations of corruption

within a police department.  Like the plaintiff in Garcetti, Ober admitted that he

"had a duty to report his concerns" about the misconduct contained in the

---

[13] Filing a federal complaint qualifies as petitioning the government and is, therefore, protected so long as the complaint is not frivolous.  Brennan v. Norton, 350 F.3d 399, 417 (3d Cir. 2003).

memorandum.[14]  (Doc. 50 ¶¶ 350, 352; Doc. 58 ¶¶ 350, 352.)  Ober further admitted

that he "fulfilled his obligations, duty and oath of office when he gave McDonald the

memo."  (Doc. 50 ¶ 284; Doc. 58 ¶ 284.)  Ober's actions in the instant case fall

squarely within the rule announced by the Court in <u>Garcetti</u>.  Because Ober was

acting pursuant to an official duty rather than as a citizen when he drafted the

memorandum, the court finds that the memorandum does not qualify for First

Amendment protection.  Therefore, the court need only address Ober's allegations

of retaliation for his grievances and federal lawsuits.

### ii.  <u>Retaliatory Action</u>

Ober alleges that defendants committed the following acts in retaliation for

his protected conduct:  (1) acquired his telephone records on October 17, 2003, his

hard drive on November 3, 2003, and the remainder of his government-issued

property on July 26, 2004, (2) initiated an investigation into the source of

information leaked to the <u>Philadelphia Daily News</u> on March 23, 2004, (3) assigned

an improper adjudicator to conduct his investigation, (4) failed to provide him with

---

[14]  In his deposition testimony, Ober made the following comments about the
scope of his duty to report the allegations contained in the memorandum:

1.  "My duty is to report the concerns that I had.";
2.  "I had a duty obligation to report [my concerns of misconduct].";
3.  "My purpose in creating [the memorandum] was to fully comply with
    the reporting regulations of [the] Pennsylvania State Police with
    respect to reporting possible misconduct in the agency."; and
4.  "My duty ended at reporting the concern [about misconduct]."

(Doc. 48, Ex. 18 at 82, 85, 104-06.)

reasonable notice of the time and date of his July 26, 2004 internal affairs interview,

(5) transferred him to BESO on July 26, 2004, (6) demoted him to sergeant,

suspended him without pay, and transferred him to Troop H, (7) denied his

reappointment to PEMA on January 20, 2003 and March 3, 2004 and to the

Centennial Book Committee on January 20, 2003,[15] (8) denied his requests to attend

training academies beginning in June of 2004, (9) failed to select him for promotion

on five occasions between February of 2003 and March of 2004, (10) cancelled the

objective examination for promotion to major on March 4, 2003, (11) provided Ober

with a negative and untimely employee performance review on September 20, 2004,

and (12) directed threatening and harassing remarks toward him during a training

session on August 6, 2004.

To qualify as retaliatory, an employer's conduct must adversely affect an

employee's First Amendment rights.  Brennan v. Norton, 350 F.3d 399, 419 (3d Cir.

2003); see also Breiner v. Litwhiler, 245 F. Supp. 2d 614, 632-33 (M.D. Pa. 2003)

(holding that conduct must be sufficient "to deter a person of ordinary firmness

from engaging in the First Amendment-protected activity" in order to qualify as

---

[15]  Ober has failed to proffer evidence to suggest that any of the defendants were personally involved in the decision to deny his reappointment to PEMA or the Centennial Book Committee.  To the contrary, Ober identifies two non-defendant State Police employees who made the decision to deny his reappointment. Accordingly, Ober's First Amendment retaliation claim must fail to the extent it is premised upon these allegedly retaliatory acts.  See Evancho, 423 F.3d at 353 ("A[n individual] defendant in a civil rights action must have personal involvement in the alleged wrongdoing . . . .").

24

retaliatory).[16]  Determining whether a plaintiff's First Amendment rights were

adversely affected is a "fact intensive inquiry focusing on the status of the speaker,

the relationship between the speaker and the retaliator, and the nature of the

retaliatory acts."  Brennan, 350 F.3d at 419.  Retaliatory acts must be "more than *de*

*minimis* or trivial" to have an adverse effect on an employee's First Amendment

rights.  Id.; see also McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006).  Decisions

relating to "promotion, transfer, recall and hiring" are significant enough to qualify

as retaliatory, while "criticism, false accusations, or verbal reprimands" are not.

Brennan, 350 F.3d at 419.

The court finds that the alleged threatening and harassing remarks of

Reynolds and McDonough are too trivial to constitute retaliatory action.  See

Brennan, 350 F.3d at 419 (stating that "criticism, false accusations, [and] verbal

reprimands" do not rise to the level of actionability under the First Amendment).

---

[16]  In 2006, the Supreme Court modified the definition of retaliatory actions in
claims asserted pursuant to Title VII.  See Burlington N. & Santa Fe Ry. Co. v.
White, 126 S. Ct. 2405 (2006).  The new standard announced by the Court requires a
Title VII plaintiff to "show that a reasonable employee would have found the
challenged action materially adverse, which in this context means it well might
have dissuaded a reasonable worker from making or supporting a charge of
discrimination."  Id. at 2415.  While it remains unclear whether the Court intended
this new standard to apply with equal force to First Amendment retaliation claims,
the law of First Amendment retaliation in the Third Circuit makes this a distinction
without a difference.  See Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000)
(discussing the Third Circuit's person of ordinary firmness standard).  See generally
John Sanchez, *The Law of Retaliation After Burlington Northern and Garcetti*, 30
AM. J. TRIAL ADVOC. 539, 565-66 (2007) (stating that the Burlington standard is
"strikingly similar if not identical" to the Third Circuit's person of ordinary
firmness standard).

The comments were made in a neutral setting during a training session for commissioned officers.  Reynolds and McDonough explained their legitimate rationales for making their respective comments, and the court has found no evidence of record to controvert these explanations.  Importantly, neither Reynolds nor McDonough referred to Ober by name or otherwise identified him.  Nor did either defendant imply that Ober was suspected of misconduct.  Because there is no evidence of record to suggest that the statements were made for any improper purpose or even inferentially directed towards Ober, the court finds that a reasonable jury could not conclude that such isolated communications constituted retaliatory action.

Several of the remaining retaliatory actions involve perceived administrative inadequacies on the part of the State Police.  These include the assignment of an improper adjudicator to conduct Ober's investigation, the failure to provide him with reasonable notice of the time and date of his internal affairs interview, the untimely completion of his employee performance review, and the cancellation of the objective examination for promotion to major.  The court finds that none of these procedural errors[17] would be sufficient to deter "a person of ordinary firmness" from engaging in a First Amendment-protected activity.  See Breiner, 245 F. Supp. 2d at 632-33.  Moreover, there is no evidence of record to suggest that these

---

[17]  The court makes no finding as to whether the actions of the defendants actually violated any State Police regulations or procedures.  For purposes of the instant motion, however, the court will construe the facts in the light most favorable to Ober and will presume these actions to be procedural errors.

procedural errors had any adverse effect on Ober.  See Suppan v. Dadonna, 203

F.3d 228, 235 (3d Cir. 2000) ("Section 1983 is a tort statute.  A tort to be actionable

requires injury.").  Ober has presented no evidence to suggest that the outcome of

his internal affairs investigation would have been different had he been provided

additional notice of the time of internal affairs interview or assigned a different

adjudicator.  Nor is there any evidence to suggest that the time delay in the receipt

of Ober's employee performance review affected his ability to complete his job or

altered the outcome of the review itself.  Finally, there is no evidence to suggest that

cancelling the objective examination for the position of major altered Ober's chance

of promotion.  To the contrary, the evidence of record suggests that the cancellation

was implemented for neutral budgetary reasons and not out of any retaliatory

animus against Ober.  Obviously, Miller's ultimate decision not to promote Ober

had a negative effect upon him, but there is simply no support for the proposition

that cancellation of the examination was a retaliatory act.[18]  Because the

aforementioned procedural errors are *de minimis* and did not cause any

---

[18] Assuming *arguendo* that cancellation of the examination was a retaliatory act, Ober's claim would nevertheless fail for lack of causation.  See infra Part III.A.1.a.iii.  There is simply no evidence of record sufficient to give rise to an inference that Miller's decision to cancel the examination was prompted by a retaliatory animus against Ober.  To the contrary, Miller testified that he cancelled the examination due to budgetary constraints.  (See Doc. 46 ¶¶ 72-73.)  Miller's testimony is bolstered by documentary evidence suggesting that the State Police experienced wide-spread budget cuts around the time of Miller's actions and that cancellation of the examination was merely one of approximately 130 cost-saving measures that Miller took to balance the State Police budget.  (See id.)  Accordingly, the court finds that a reasonable jury could not conclude that Miller's actions were caused by Ober's exercise of his protected First Amendment rights.

constitutional injury to Ober, the court finds that they do not constitute retaliatory actions.

Having made the foregoing findings, the court will assume for purposes of analysis that the remaining acts alleged by Ober are sufficiently retaliatory to satisfy the second element of the prima facie case.  Accordingly, the court will turn to an analysis of the final element - causation.

### iii.   **Causation**

To establish the causation element of a retaliation claim, a plaintiff must prove that the exercise of his First Amendment rights "played some substantial role" in motivating the retaliatory act.  Meenan v. Harrison, Civ. A. No. 3:03-CV-1300, 2006 WL 1000032, at *4 (M.D. Pa. Apr. 13, 2006).  However, a plaintiff need not prove that the retaliation was "motivated solely or even primarily by the protected activity."  Id.  If a plaintiff meets this burden, the defendant can rebut the claim of causation by showing that "the same adverse action would have taken place in the absence of the protected conduct."  Chambers, 2006 WL 3831377, at *7; see also Baldassare, 250 F.3d at 194.  The Third Circuit has recently highlighted the importance of a strict interpretation of the causation requirement as follows:

> A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take.

Lauren W. ex rel. Jean W. v. Deflaminis, 480 F.3d 259, 267 (3d Cir. 2007).

The temporal proximity of a retaliatory act to a plaintiff's exercise of his First Amendment rights is probative, but not dispositive, of the causation element of a retaliation claim. Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003). As the Third Circuit has stated:

> [I]t is causation, not temporal proximity itself, that is an element of plaintiff prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn. The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific. When there may be valid reasons why the adverse employment action was not taken immediately, the absence of immediacy between the cause and effect does not disprove causation.

Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997). For temporal proximity alone to establish causation, the time difference must be so short as to be "unusually suggestive of retaliatory motive." Marasco, 318 F.3d at 512. While the Third Circuit has not explicitly defined the closeness in time required to be "unusually suggestive" of retaliatory motive, the court has held that a temporal proximity of two days was sufficient to establish causation on its own, see Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 n. 5 (3d Cir. 2000), while a temporal proximity of tens days was sufficient to establish causation only when accompanied by other evidence of wrongdoing on the part of the employer, Shellenberger v. Summit Bancorp., Inc., 318 F.3d 183, 189 (3d Cir. 2003). This suggests that the difference in time must be measured in days, rather than in weeks or months, to suggest causation on its own. Where such closeness in time is lacking, "circumstantial evidence of a 'pattern of antagonism' following the protected

conduct" or any other suggestions of causation that can be gleaned from the record "as a whole" can also give rise to an inference of causation.  Farrell, 206 F.3d at 280 (quoting Kachmar, 109 F.3d at 177); see also Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003) (suggesting that "timing plus other evidence" may be an appropriate test for causation).

In the instant case, none of the remaining retaliatory actions so closely follows a protected activity as to be unusually suggestive of causation.  In fact, the shortest temporal proximity between a protected activity and a retaliatory action is the forty-nine day difference in time between the filing of Ober's first grievance on August 2, 2004 and the issuance of his employee performance review on September 20, 2004.  Our sister courts have held that a temporal proximity of as little as seventeen days was insufficient to establish causation.  See Killen v. N.W. Human Servs., Inc., No. 06-4100, 2007 WL 2684541, at *8 (E.D. Pa. Sept. 7, 2007) (holding that temporal proximity of seventeen days was insufficient to establish causation); see also Farrell, 206 F.3d at 279 n. 6 (suggesting that temporal proximity of seven weeks would be insufficient to establish causation); Smith v. ABF Freight Sys., Inc., No. 04-2231, 2007 WL 3231969, at *11 (M.D. Pa. Oct. 29, 2007) (holding that temporal proximity of one and one-half months was insufficient to establish causation); Mar v. City of McKeesport, No. 05-19, 2007 WL 2769718, at *4 (W.D. Pa. Sept. 20, 2007) (holding that temporal proximity of three months was insufficient to establish causation).  Accordingly, the court must analyze the record "as a whole" for any additional evidence that may give rise to an inference of causation.

The court finds that the record demonstrates that the vast majority of the alleged retaliatory actions were prompted not by Ober's protected activities but by Ober's July 25, 2003 memorandum.  In <u>Bailey v. Commerce National Insurance Services, Inc.</u>, 474 F. Supp. 2d 577 (D. Del. 2007), the plaintiff's employment was terminated eight weeks after the conclusion of an internal investigation into her complaint of workplace harassment.  <u>Id.</u> at 584.  Prior to her termination and after the conclusion of the internal investigation, the plaintiff engaged in a variety of inappropriate workplace behavior, including a dress code violation, an absence from a mandatory training session, and the use of profanity in the workplace.  <u>Id.</u> Our sister court in the District of Delaware held that, despite the temporal proximity between the investigation's conclusion and the plaintiff's termination, causation had not been established because of the plaintiff's intervening acts of workplace impropriety.  <u>Id.</u>  In other words, temporal proximity strongly suggested that the plaintiff had been terminated because of her inappropriate behavior rather than because of her complaint of workplace harassment.  <u>See id.</u>; <u>see also</u> <u>Thomas</u>, 351 F.3d at 114 (holding twenty-two day temporal proximity insufficient to establish causation where plaintiff was terminated on the final day of her probationary period and was absent from work on the two immediately preceding days; stating that "the chronology of events far more strongly suggests a situation in which a probationary employee was determined to be a poor risk as far as dependability was concerned").  Similarly, in the instant case, Ober's decision to share his July 25, 2003 memorandum with his attorney was viewed by defendants as an act of

31

workplace impropriety.  Most of the retaliatory actions alleged by Ober were in closer temporal proximity to defendants' discovery of this impropriety than to the filing of <u>Ober I</u> and <u>Ober II</u>.[19]  The court finds that, with respect to these alleged retaliatory acts, the intervening workplace impropriety committed by Ober when he disseminated confidential information to his attorney breaks the chain of causation.

In addition, several of the alleged retaliatory actions are linked to the July 25, 2003 memorandum not only in terms of temporal proximity but also in terms of subject matter.  When the <u>Philadelphia Daily News</u> published an article that contained confidential information, several of the defendants appropriately decided to ascertain the source of the leaked information.  Eventually, it came to light that the news article bore a close resemblance to Ober's July 25, 2003 memorandum. Quite reasonably, this led defendants to focus their investigation on Ober, which ultimately resulted in several of the actions that Ober now asks the court to deem retaliatory.  Most notably among these are Ober's transfer to BESO, the confiscation of his government-issued property, his recommended demotion,

---

[19]  The July 25, 2003 memorandum was followed by these allegedly retaliatory actions:  (1) the October 17, 2003 search of Ober's telephone records, (2) the November 3, 2003 search of Ober's hard drive, (3) the February 28, 2004 failure to promote Ober, (4) the March 3, 2004 denial of reinstatement to PEMA, (5) the March 13, 2004 failure to promote, (6) the March 23, 2004 initiation of a formal internal investigation, (7) the March 24, 2004 assignment of an adjudicator to the internal investigation, (8) the June 2004 denial of Ober's training request, (9) the July 26, 2004 internal affairs interview for which Ober received no notice, (10) the July 26, 2004 transfer of Ober to BESO, and (11) the July 26, 2004 confiscation of Ober's government-issued property.  Clearly, these allegedly retaliatory actions were much further removed in time from the January 16, 2001 filing of <u>Ober I</u> and the November 29, 2002 filing of <u>Ober II</u> than from the July 25, 2003 memorandum.

temporary suspension and transfer, and his receipt of a negative employee performance review.[20]  Viewing the record as a whole, the court finds that these allegedly retaliatory acts were clearly prompted by the July 25, 2003 memorandum rather than by Ober's protected activities.  Accordingly, the causation element of the prima facie case has not been satisfied with respect to the aforementioned retaliatory actions.

The remaining retaliatory actions, namely the failures to promote between February 1, 2003 and July 5, 2003, followed most closely the November 29, 2002 filing of Ober II.  More specifically, the failures to promote occurred at approximately two month intervals following the filing of Ober II.  This temporal proximity is not so unduly suggestive as to give rise to an inference causation when standing alone; however, the court is also cognizant of a January 22, 2003 email received by Ober in response to his request for reinstatement to the Centennial Book Committee.  In this email, a State Police employee stated:

> I have been advised that it may be better to what [sic] until your legal issues are settled with the Department before having you rejoin the book committee.
> Hopefully everything works out for you soon.

---

[20]  The link between the July 25, 2003 memorandum and the negative employee performance review is revealed by McDonald in the review itself. McDonald specifically stated that the negative review reflected "the results of an internal investigation culminating in disciplinary action for improper dissemination of confidential Department information, contrary to Department Regulations." (Doc. 52, Ex. 205 at 3.)

(Doc. 52, Ex. 253.)  Viewing this statement in the light most favorable to Ober, it suggests a general sentiment that Ober's pending litigation was a hindrance to his advancement and job performance within the State Police.  Based upon this evidence, the court finds that a reasonable jury could conclude that Miller's periodic decisions to deny Ober a promotion to the position of major were prompted by the protected activity of filing <u>Ober II</u>.[21]

In sum, the court finds that, although Ober engaged in protected speech, he has failed to establish that any of defendants' actions, aside from Miller's failure to select him for promotion between February 1, 2003 and July 5, 2003, were in retaliation for that speech.  Accordingly, the court will grant defendants' motion for summary judgment with respect to each of Ober's retaliation claims except for the claim arising from Miller's failure to select Ober for promotion between February 1, 2003 and July 5, 2003.[22]

---

[21]  <u>See</u> <u>infra</u> Part III.A.2 for a discussion of the inapplicability of a qualified immunity defense to this claim.

[22]  Ober also seeks the entry of judgment in his favor on this claim against Miller.  (<u>See</u> Doc. 49.)  However, the court finds that a question of fact remains as to Miller's subjective motivation in bypassing Ober for promotion.  The small number of individuals chosen for promotion from a relatively large pool lends credence to the position that the decisions were made for legitimate workplace reasons rather than out of a retaliatory animus against Ober.  <u>See</u> <u>supra</u> note 10.  The court finds there is a genuine issue of material fact as to the reasons why Ober was not promoted and the court will deny Ober's motion for summary judgment with respect to this claim.

**b.   First, Sixth, and Fourteenth Amendment Rights to Counsel**

Ober asserts that defendants violated his right to counsel pursuant to the First, Sixth, and Fourteenth Amendments when they disciplined him for consulting with his attorney.  The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."  U.S. CONST. amend. VI.  However, the Sixth Amendment right to counsel does not attach until the initiation of formal criminal proceedings.  See James v. York County Police Dep't, 160 F. App'x 126, 131-32 (3d Cir. 2005); see also Brewer v. Williams, 430 U.S. 387, 398 (1977).  The same is true for the right to counsel pursuant to the Fourteenth Amendment.  See United States v. Gouveia, 467 U.S. 180, 187-88 (1984) ("[A] person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him . . . whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.").  The Sixth and Fourteenth Amendment rights to counsel have not been extended to civil or administrative proceedings. See United States v. Sturgis, 342 F.2d 328 (3d Cir. 1965) (discussing civil proceedings); DeWalt v. Barger, 490 F. Supp. 1262, 1272-74 (M.D. Pa. 1980) (discussing administrative proceedings).  In the instant case, no criminal proceedings have ever been initiated against Ober.  Accordingly, no right to counsel attached, and the court will grant defendants' motion for summary judgment with respect to Ober's Sixth and Fourteenth Amendment right to counsel claims.

Ober also asserts a right to counsel claim pursuant to the First Amendment. The First Amendment's right to petition the government for redress of grievances extends to the "right to hire and consult an attorney." Cipriani v. Lycoming County Hous. Auth., 177 F. Supp. 2d 303, 323-24 (M.D. Pa. 2001). However, Ober's right to hire and consult an attorney was not implicated in the instant case. Ober was punished not for seeking his attorney's advice but for revealing confidential information to a third party, an act that violated State Police regulations. That the third party is an attorney does not excuse the violation or implicate the attorney-client privilege because the privilege merely operates to protect the confidences of the client from disclosure by the attorney. This is not a case in which client confidences were improperly revealed. To the contrary, Ober freely admitted that he discussed confidential State Police information with his attorney and signaled this transgression by including the phrase "CC: Don Bailey" on his July 25, 2003 memorandum.

The First Amendment right to hire and consult an attorney does not permit an individual to commit illegal acts or other improprieties in the course of obtaining legal representation. See, e.g., Taylor v. City of Phila., No. 03-3068, 2004 WL 1126015, at *13 (E.D. Pa. May 20, 2004) (holding that right to secure counsel did not justify plaintiff's decision to remove evidence from her home in an attempt to thwart an ongoing investigation of her son). Because Ober was punished for committing an impropriety rather than for consulting with his counsel of choice, his

36

First Amendment rights were not violated and the court will grant defendants'
motion for summary judgment with respect to this claim.[23]

### c.   **Fourth Amendment Search and Seizure**

Ober claims that defendants violated his Fourth Amendment rights when
they confiscated various items of government-issued equipment on three occasions.
Unlawful search and seizure claims require proof of an unconstitutional invasion of
a plaintiff's "reasonable expectation of privacy" or a deprivation of his or her
interest in property.  See Soldal v. Cook County, 506 U.S. 56, 62-64 (1992); Rakas v.
Illinois, 439 U.S. 128, 133-35 (1978) (citing Alderman v. United States, 394 U.S. 165,
174 (1969)).  The United States Supreme Court has "explicitly rejected the
contention that public employees can never have a reasonable expectation of
privacy in their workplace."  Phila. Fed'n of Teachers v. Sch. Dist. of Phila., No. 97-
4168, 1998 WL 196403, at *6 (E.D. Pa. Apr. 23, 1998) (citing O'Connor v. Ortega, 480
U.S. 709, 717 (1987) (plurality opinion)).  However, a public employee's privacy
interest in his or her place of work is far less than that "found at home or in some
other contexts."  Ortega, 480 U.S. at 725.  This is because public workplaces "are
provided to employees for the sole purpose of facilitating the work of an agency,"
and the employee may easily protect his or her privacy interests by leaving personal
belongings at home.  Id.  Whether a particular public employee possesses a

---

[23]  Ober's First Amendment right to counsel argument is also largely
repetitive of his First Amendment retaliation claim.  (See Doc. 60 at 52-53.)
Accordingly, the court's previous discussion of Ober's First Amendment retaliation
applies with equal force to the instant claim.  See supra Part III.A.1.a.

reasonable expectation of privacy in his or her workplace must be assessed on a

"case-by-case basis" and "in the context of the employment relation." <u>Brambrinck</u>

<u>v. City of Phila.</u>, No. 94-1673, 1994 WL 649342, at *8 (E.D. Pa. Nov. 15, 1994) (citing

<u>Ortega</u>, 480 U.S. at 717-18).

According to the <u>Ortega</u> Court, "[t]he operational realities of the workplace

. . . may make *some* employees' expectations of privacy unreasonable." <u>Ortega</u>, 480

U.S. at 717 (emphasis in original).  A public employee's reasonable expectation of

privacy may be reduced or eliminated by "legitimate regulations" or by "office

practices and procedures," such as how frequently coworkers and other individuals

are permitted to enter the area that was searched.  <u>Brambrinck</u>, 1994 WL 649342, at

*8 (citing <u>Ortega</u>, 480 U.S. at 717); <u>see also</u> <u>Katz v. United States</u>, 389 U.S. 347, 351

(1967) ("What a person knowingly exposes to the public, even in his own home or

office, is not a subject of Fourth Amendment protection.").  A public employee's

reasonable expectation of privacy may also be reduced if that employee is involved

in "an industry that is regulated pervasively to ensure safety," <u>Chicago Fire</u>

<u>Fighters Union, Local 2 v. City of Chicago</u>, 717 F. Supp. 1314, 1318 (N.D. Ill. 1989)

(holding that firefighters had no reasonable expectation of privacy in their lockers

because of the employer's interest in ensuring their safety), or is discharged or

suspended from his or her position, <u>Shaul v. Cherry Valley-Springfield Cent. Sch.</u>

<u>Dist.</u>, 363 F.3d 177, 183 (2d Cir. 2004) (stating that an employee's suspension "greatly

reduced-if not eliminates-his reasonable expectation of privacy in his former

workplace").

38

In the instant case, Ober alleges that his Fourth Amendment rights were violated on three separate occasions. The first occurred on October 17, 2003, when Brown accessed Ober's workplace telephone records. (Doc. 50 ¶¶ 579, 581; Doc. 58 ¶¶ 579, 581.) The second occurred on November 3, 2003, when several defendants confiscated and scanned the hard drive from Ober's office computer. (Doc. 42., Ex. 62; Doc. 50 ¶¶ 583, 621; Doc. 58 ¶¶ 583, 621.) The third occurred on July 26, 2004, the day of Ober's transfer to BESO. During this third search, several defendants confiscated and searched Ober's government-issued property. (Doc. 52, Ex. 294; Doc. 50 ¶¶ 625, 697; Doc. 58 ¶¶ 625, 697.)

To the extent that Ober's Fourth Amendment claim is premised on the search and seizure of his telephone records, that claim must fail. In <u>Smith v. Maryland</u>, 442 U.S. 735 (1979), the United States Supreme Court held that an individual has no reasonable expectation of privacy regarding the numbers he or she dialed on a telephone. <u>Id.</u> at 742. The court went on to state:

> Telephone users . . . typically know that they must convey numerical information to the phone company; that the phone company has facilities for recording this information; and that the phone company does in fact record this information for a variety of legitimate business purposes. Although subjective expectations cannot be scientifically gauged, it is too much to believe that telephone subscribers, under these circumstances, harbor any general expectation that the numbers they dial will remain secret.

<u>Id.</u> at 743. Moreover, the court reasoned that the location from which the telephone call is placed is immaterial to the outcome because it does not alter the fact that the telephone company has direct access to all numbers that have been dialed. <u>Id.</u> Based upon the foregoing, the court finds that Ober possessed no reasonable

expectation of privacy in his telephone records and that, therefore, no unlawful

search or seizure occurred when Brown confiscated and reviewed the records of

Ober's office telephone.

With respect to the second and third searches, defendants argue that these

searches did not violate the Fourth Amendment because a State Police policy

eliminated Ober's reasonable expectation of privacy in his place of work. Section

25.10(D)(10) of the State Police administrative regulations dealing with internal

investigations provides, in pertinent part, as follows:

> *Department* property may be searched at any time, even if assigned to or used
> exclusively by a single individual. This search may be conducted by any
> authorized person pursuant to an investigation.

(Doc. 52, Ex. 143 at 25 (emphasis added)). The court finds that this policy is the type

of "legitimate regulation" that insulates a public employer from liability for

searches of an employee's work space. See Ortega, 480 U.S. at 717. The policy puts

all State Police employees on notice that their government-issued property may be

searched at any time during the course of an internal investigation and removes any

reasonable expectation of privacy that the employees may otherwise have in such

property for the duration of the investigation. In this case, Ober admits that the

internal investigation into his alleged misconduct began as early as November 3,

2003, which would insulate the second and third searches from Fourth Amendment

scrutiny. (Doc. 50 ¶¶ 26, 583, 621; Doc. 58 ¶¶ 26, 583, 621.) Moreover, the third

search was conducted *after* Ober had been transferred to BESO, which further

reduces any reasonable expectation of privacy he may have had in his former place of work.  See Shaul, 363 F.3d at 183.

Alternatively, assuming that Ober was not on notice of the internal investigation until Periandi's official complaint was filed on March 23, 2004 (see Doc. 42, Ex. 30), his claim regarding the second search nevertheless would fail.  The court finds that the prevalence of workplace monitoring of computers makes any expectation of privacy that a public employer has in the contents of his or her computer unreasonable.  In so finding, the court is persuaded by the reasoning of the Ninth Circuit Court of Appeals in United States v. Ziegler, 456 F.3d 1138 (9th Cir. 2006), which held that a typical public employee had no reasonable expectation of privacy in the contents of his workplace computer.  The court went on to explain that:

> Social norms suggest that employees are not entitled to privacy in the use of workplace computers, which belong to their employers and pose significant dangers in terms of diminished productivity and even employer liability. This, in the ordinary case, a workplace computer simply "does not provide the setting for those intimate activities that the Fourth Amendment is intended to shelter from government interference or surveillance."

Ziegler, 456 F.3d at 1145 (quoting Oliver v. United States, 466 U.S. 170, 179 (1984). Several other courts of appeals, including the Tenth, Eighth, and Fourth Circuits, have similarly held that an employee bore no reasonable expectation of privacy in the contents of his or her office computer.  See United States v. Barrows, 481 F.3d 1246, 1248 (10th Cir. 2007) (holding that employee bore no reasonable expectation of privacy in the contents of his *personal* computer because he "voluntarily transferred

41

[it] to a public place for work-related use," failed to take any "steps to prevent third-party use," and "knowingly networked" it with other workplace computers); <u>Biby v. Bd. of Regents</u>, 419 F.3d 845, 850-51 (8th Cir. 2005) (holding that employee had no reasonable expectation of privacy where employer policy reserved the right to search employee's computer for any legitimate reason); <u>United States v. Thorn</u>, 375 F.3d 679, 683 (8th Cir. 2004) (holding that employee bore no reasonable expectation of privacy in the contents of his workplace computer where a computer-use policy provided that employer had "right to access all of the [employer's] computers in order to audit their use"); <u>United States v. Simons</u>, 206 F.3d 392, 298 (4th Cir. 2000) (concluding that employee had no reasonable expectation of privacy in contents of computer where workplace policy permitted random audits of computer usage).[24]

For the foregoing reasons, the court finds that Ober did not possess a reasonable expectation of privacy in the items that were subjected to search and seizure. Accordingly, the court will grant defendants' motion for summary judgment with respect to Ober's Fourth Amendment claims.

---

[24] <u>Contra</u> <u>United States v. Slanina</u>, 283 F.3d 670, 676-77 (5th Cir. 2002) (holding that employee had reasonable expectation of privacy in contents of office computer where employee's computer was password protected and employer had not disseminated a policy limited personal use of computers); <u>Leventhal v. Knapek</u>, 266 F.3d 64, 73-74 (2d Cir. 2001) (determining that employee had reasonable expectation of privacy in contents of office computer where employer had not placed employee "on notice that he should have no expectation of privacy in the contents of his office computer" and employee had exclusive use of his computer).

### d.    Fourteenth Amendment Right to Equal Protection

Ober alleges that defendants violated his right to equal protection by holding him to a heightened standard of discipline.  (See Doc. 10 ¶ 153.)  Violations of the Equal Protection Clause of the Fourteenth Amendment may be established by proof that officials "intentionally treated [some persons] differently from others similarly situated" and "that there is no rational basis for the difference in treatment."  Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam); accord Snowden v. Hughes, 321 U.S. 1, 8 (1944).  The size of the group targeted for discrimination is "immaterial for equal protection analysis."  Olech, 528 U.S. at 564.  Thus, a single individual subjected to unequal enforcement of the laws may maintain a § 1983 claim as a "class of one."  Id. at 564.  See generally Hortensia S. Carreira, Protecting the "Class of One," 36 REAL PROP. PROB. & TR. J. 331 (2001).

In the instant case, defendants seek entry of judgment on Ober's equal protection claim on grounds that Ober has failed to establish that he was intentionally treated differently than others similarly situated.  (Doc. 47 at 31 n.23.)  In response, Ober fails to offer any argument to support his equal protection claim.  Accordingly, the court concludes that Ober has abandoned this claim.  See D'Angio v. Borough of Nescopeck, 34 F. Supp. 2d 256, 265 (M.D. Pa. 1999) (noting that abandonment of a position is tantamount to waiver); see also L.R. 7.6.  Accordingly, the court will grant defendants' motion for summary judgment with respect to Ober's equal protection claim.

e. **Conspiracy**

Ober sets forth his § 1983 conspiracy claim as an independent cause of action,
alleging that defendants conspired to deny him equal protection of the laws and to
deprive him of his First Amendment rights.[25]  (See Doc. 10 ¶¶ 53-98, 153.)  However,
conspiracy under § 1983 is not an independent cause of action, but a means to
impute liability on third persons.  <u>Kost v. Kozakiewicz</u>, 1 F.3d 176, 185 (3d Cir.
1993); <u>see also</u> <u>Holt Cargo Sys., Inc. v. Del. River Port Auth.</u>, 20 F. Supp. 2d 803, 843
(E.D. Pa. 1998) (stating that "§ 1983 does not provide a cause of action *per se* for
conspiracy to deprive one of a constitutional right") (citations omitted); <u>Kaplan v.
Clear Law City Water Auth.</u>, 794 F.2d 1059, 1065 (5th Cir. 1986) (stating that § 1983
conspiracy is not a claim in itself, but "can furnish the conceptual spring for
imputing liability from one to another. . . ."); <u>Landrigan v. City of Warwick</u>, 628 F.2d
736, 742 (1st Cir. 1980) (stating that § 1983 "[c]onspiracy is merely a mechanism by
which to obtain the necessary state action, or to impose liability on one defendant
for the acts of the others performed in pursuance of the conspiracy") (citations
omitted); <u>Nieves v. McSweeney</u>, 73 F. Supp. 2d 98, 104 (D. Mass. 1999) ("In a
[s]ection 1983 cause of action, an allegation of conspiracy is merely a mechanism by
which to obtain the necessary state action or to impose liability on one defendant

---

[25]  A plaintiff averring a § 1983 conspiracy claim must show that defendants
"somehow reached an understanding" to violate plaintiff's rights, and did in fact
violate those rights.  <u>Demyun v. Pa. Dept. of Corrections</u>, No. 00-155, 2001 WL
1083936, *6 (M.D. Pa. 2001); <u>Dennison v. Pa. Dept. of Corrections</u>, 268 F. Supp. 2d
387, 410 (M.D. Pa. 2003).

for the acts of the others performed in furtherance of the conspiracy."); <u>Hanten v. Sch. Dist. of Riverview Gardens</u>, 13 F. Supp. 2d 971, 978 (E.D. Mo. 1998) (stating that § 1983 conspiracy "does not set forth an independent cause of action") (citations omitted).

Ober's § 1983 conspiracy claim is merely duplicative of others claims averred in his complaint.  It is not a separate cause of action.  Therefore, defendants' motion for summary judgment on the § 1983 conspiracy claim will be granted without further analysis.

## 2.   **Clearly Established Rights**

Based on the court's findings that Ober has established a prima facie claim of retaliation based upon Miller's failure to select him for promotion between February 1, 2003 and July 5, 2003, the court must determine whether Miller is entitled to qualified immunity.  To determine whether a public official is entitled to qualified immunity, the court must ascertain "whether a reasonable public official would know that his or her specific conduct violated clearly established rights." <u>Grant</u>, 98 F.3d at 121 (citing <u>Anderson v. Creighton</u>, 483 U.S. 635, 636-37 (1987)).  This requires an examination of whether, taking the evidence in the light most favorable to the plaintiff, the defendant should have known that his or her actions contravened statutory or constitutional guarantees.  <u>Gruenke</u>, 225 F.3d at 299-300. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in

the light of pre-existing law the unlawfulness must be apparent." <u>Anderson</u>, 483

U.S. at 640 (citation omitted).

The court finds that Miller is not entitled to immunity with respect to the

retaliation claim premised on the failures to promote.  At the time of Miller's

actions, "the law was clearly established that a public employee, such as [Ober],

could not be retaliated against for exercising his rights under the First

Amendment." <u>Cipriani</u>, 177 F. Supp. 2d at 327 (citing <u>Baldassare</u>, 205 F.3d at 201.)

It was also clearly established that failing to promote an individual constituted a

retaliatory action for First Amendment purposes.  <u>See</u> <u>Brennan</u>, 350 F.3d at 419

(stating that decisions relating to "*promotion*, transfer, recall and hiring" are

significant enough to qualify as retaliatory (emphasis added)).   Accordingly, Miller

should have recognized that his conduct rose above the floor of a civil rights

violation, so the defense of qualified immunity cannot shield him from liability.

### B.   <u>State Tort Claim - Defamation</u>

To establish a prima facie claim of defamation pursuant to Pennsylvania law,

a plaintiff must prove that:  (1) the communication was defamatory in nature, (2) the

communication was published by the defendant, (3) the communication applied to

the plaintiff, (4) the recipient of the communication understood its defamatory

meaning and its application to the plaintiff, and (5) the plaintiff suffered special

harm as a result of the communication's publication.  42 PA. CONS. STAT. ANN.

§ 8343(a); <u>see also</u> <u>Zugarek v. S. Tioga Sch. Dist.</u>, 214 F. Supp. 2d 468, 480 (M.D. Pa.

2002).  Truth is an absolute defense to a defamation claim.  <u>See</u> 42 PA. CONS. STAT.

ANN. § 8343(b); see also Weaver v. Lancaster Newspapers, Inc., 926 A.2d 899, 903

(Pa. 2007); Bakare v. Pinnacle Health Hospitals, Inc., 469 F. Supp. 2d 272, 298 (M.D.

Pa. Aug 24, 2006) (granting summary judgment in favor of defendant on ground that

alleged defamatory statement was true).  To prevail on a defense of truthfulness,

the defendant bears the burden of proving that the alleged defamatory statement is

"substantially true."  Simms v. Exeter Architectural Prods., Inc., 916 F. Supp. 432,

437 (M.D. Pa. 1996); see also Moore v. Cobb-Nettleton, 889 A.2d 1262, 1267

(Pa. Super. Ct. 2005).  That a statement contains only expressions of the speaker's

opinion, rather than statements of fact, is also an absolute defense to a defamation

claim.  Moore, 889 A.2d at 1267.  Likewise, the publisher of a defamatory statement

is not liable if a conditional privilege applies.  See Simms, 916 F. Supp. at 436.  A

conditional privilege arises "when the communication involves an interest of the

publisher, the recipient, a third party or the public."  Id.; see also Rue v. K-Mart

Corp., 691 A.2d 498, 509 (Pa. Super. Ct. 1997) ("Such a [conditional] privilege

attaches when the statement is made on a proper occasion, in a proper manner, for

a legitimate reason of the speaker and is based on reasonable cause.").  However,

this conditional privilege may not attach if the plaintiff demonstrates that the

defendant abused the privilege by communicating in a reckless or negligent

manner or by exceeding the necessary scope of the communication.  See Simms,

916 F. Supp. at 436; see also Rue, 691 A.2d at 509.

In the instant case, Ober alleges that Lewis defamed him by drafting a

response to an article published in the Philadelphia Daily News.  Lewis's response

47

stated that: (1) Ober had "initiated two federal district court lawsuits against the [State Police] alleging that improper disciplinary action was taken against him," (2) "both of these suits were dismissed," and (3) "the Third Circuit Court of Appeals subsequently upheld the dismissals." (See Doc. 48, Ex. 54.) The court finds that Lewis has met his burden of proving that this response was substantially true and is, therefore, not defamatory. See Simms, 916 F. Supp. at 437. Lewis was merely summarizing the facts and procedural histories of Ober I and Ober II as set forth supra in Parts I.A and I.B. Lewis did so in a neutral way that was meant to explain and inform, rather than to harm Ober's reputation. See Remick v. Manfredy, 238 F.3d 248, 261 (3d Cir. 2001) (stating that a defamatory statement is one that presents untrue facts tending to "harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him"). Accordingly, the court will grant defendants' motion for summary judgment with respect to Ober's defamation claim against Lewis.

Ober also alleges that Titler defamed him when he issued the notification of disciplinary action, which states:

> It was my determination that the actions of Captain Ober in this matter were in violation of the following Field Regulations:
> FR 1-1.05, Dissemination of Information
> FR 1-2.02, Performance of Duty
> FR 1-1.18, Interference with Investigations
> FR 1-2.02, Competency

(Doc. 52, Ex. 83 at 1.) These findings are contained in a document that is marked confidential, but that indicates distribution to several State Police officials. (Id. at 1,

48

3.) The court finds that Ober's defamation claim fails because Titler's statement was nothing more than an expression of his opinion that Ober had violated the enumerated regulations.  See Moore, 889 A.2d at 1267.  In addition, Titler's statement was clearly entitled to a conditional privilege.  Titler drafted the notification of disciplinary action as a component of the State Police policy on discipline, rather than out of a desire to harm Ober's reputation.  (See Doc. 52, Ex. 150); see also Rue, 691 A.2d at 509 (stating that conditional privilege applies to statements that were  "made on a proper occasion, in a proper manner, [and] for a legitimate reason").  Accordingly, the court will grant defendants' motion for summary judgment with respect to Ober's defamation claim against Titler.[26]

---

[26] It remains unclear whether Ober intends to assert a separate claim of false light misrepresentation.  Assuming *arguendo* that such a claim has been asserted, Ober's claim must fail.  To establish a claim of false light misrepresentation in Pennsylvania, a plaintiff must prove that the defendant :

(a) placed him or her in a false light that would be "highly offensive to a reasonable person," and
(b) the defendant "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the [plaintiff] would be placed."

Jones v. City of Phila., 893 A.2d 837, 844 (Pa. Cmwlth. Ct. 2006) (citing RESTATEMENT (SECOND) OF TORTS § 652E); see also Strickland v. Univ. of Scranton, 700 A.2d 979, 987 (Pa. Super. Ct. 1997) (stating that false light claims involve "publicity that unreasonably places the other in a false light before the public").  The truth of Lewis' statement insulates him from a false light misrepresentation claim.  In addition, Titler's statement is clearly not of the type that a reasonable person would find "highly offensive."  See Jones, 893 A.2d at 844.  Accordingly, the court will grant summary judgment in favor of defendants on Ober's false light claims.

**IV.**   **<u>Conclusion</u>**

For the foregoing reasons, the court will grant defendants' motion for summary judgment with respect to all claims except the First Amendment retaliation claim against Miller and the declaratory judgment claim.  Plaintiff's motion for summary judgment will be denied.  An appropriate order will issue.

<u>  S/ Christopher C. Conner  </u>
CHRISTOPHER C. CONNER
United States District Judge

Dated:        December 18, 2007

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CAPTAIN DARRELL OBER, | : | CIVIL ACTION NO. 1:04-CV-1669 |
| Plaintiff | : | (Judge Conner) |
| | : | |
| v. | : | |
| | : | |
| COMMISSIONER JEFFREY | : | |
| B. MILLER, LT. COLONEL RALPH | : | |
| PERIANDI, MAJOR LEONARD | : | |
| MCDONALD, LT. COLONEL JOHN | : | |
| BROWN, MAJOR CHARLES | : | |
| SKURKIS, CORPORAL ROBERT | : | |
| MRGICH, MAJOR COLEMAN J. | : | |
| MCDONOUGH, JACK LEWIS, | : | |
| JOANNA REYNOLDS, and | : | |
| CAPTAIN ROBERT B. TITLER, | : | |
| Defendants | : | |

## ORDER

AND NOW, this 18th day of December, 2007, upon consideration of the

motions for summary judgment (Docs. 43, 49), and for the reasons set forth in the

accompanying memorandum, it is hereby ORDERED that:

1. Defendants' motion for summary judgment (Doc. 43) is GRANTED in
   part and DENIED in part as follows:

   a. Defendants' motion for summary judgment is GRANTED with
      respect to the following claims:  (a) the right to counsel, unlawful
      search and seizure, equal protection, and conspiracy claims
      pursuant to § 1983 against all defendants, (b) the retaliation
      claim pursuant to § 1983 against defendants Ralph Periandi,
      John Brown, Leonard McDonald, Charles Skurkis , Coleman
      McDonough, Robert B. Titler, Robert Mrgich, Jack L. Lewis,
      and Joanna N. Reynolds, (c) all retaliation claims against
      defendant Jeffrey B. Miller except those arising from the
      failures to promote between February 1, 2003 and July 5, 2003,
      and (d) the false light misrepresentation, defamation, civil
      conspiracy, and intentional infliction of emotional distress
      claims pursuant to state law against all defendants.

      b.     Defendants' motion for summary judgment is otherwise DENIED.  <u>See</u> FED. R. CIV. P. 56(c).

2.     Plaintiff's motion for summary judgment (Doc. 49) is DENIED.  <u>See</u> FED. R. CIV. P. 56(c).

3.     The Clerk of Court is directed to defer the entry of judgment until the conclusion of this case.

4.     On or before January 14, 2008, defendants shall be permitted to file a motion for summary judgment addressing plaintiff's declaratory judgment claim.  <u>See</u> FED. R. CIV. P. 56; L.R. 56.1.

5.     A revised pretrial and trial schedule shall issue by future order of court.

       <u>  S/ Christopher C. Conner    </u>
       CHRISTOPHER C. CONNER
       United States District Judge